ALLAN J. SMIETANKA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smietanka v. Commissioner
Docket No. 10874-78.
United States Tax Court
T.C. Memo 1980-530; 1980 Tax Ct. Memo LEXIS 54; 41 T.C.M. (CCH) 451; T.C.M. (RIA) 80530; December 1, 1980
Allan J. Smietanka, pro se. Mitchell S. Fuerst, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a $9,698.01 deficiency in petitioner's 1975 income tax liability. The issue for our decision *55 is whether petitioner is entitled to a casualty loss deduction for storm damage to lakefront property. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation and the attached exhibits are incorporated herein by reference. At the time the petition in this case was filed, petitioner resided in Chicago, Illinois. During 1919 and 1920, petitioner's parents, Julius J. and Mary B. Smietanka (hereinafter referred to as "Julius" and "Mary"), purchased approximately 61.6 acres of realty located in Berrien County, Michigan (sometimes referred to hereinafter as the "property" or the "Michigan property"). Subsequently, this property came to be viewed in the eyes of the Smietanka family (which resided in Chicago) as the family farm. The advent of the Depression brought financial difficulties for Julius. Soon thereafter, Julius's debts exceeded his assets. In an effort to stave off Julius's creditors, Julius and Mary conveyed their remaining assets, among which included the Michigan property, into an express trust. The trust was intended to provide security for Julius's creditors. The trust, dated October 2, 1931, stated that its primary *56 purpose was the satisfaction of Julius's existing creditors on a ratable and nonpreferential basis. It was the intention of Mary and Julius to provide for an orderly liquidation of their assets. The trust further provide that after this purpose had been accomplished the remaining assets were to be delivered to Julius or Mary, or the survivor thereof, "OR TO THE HEIRS AT LAW OF THE SURVIVOR, IF BOTH OF THEM SHALL HAVE DIED." Julius died intestate on January 4, 1951, survived by Mary and five of their children. At the time of his death, Julius had at least $ 86,455 in debts outstanding. [1] Of this amount, approximately $ 79,155 were "new" debts, i.e., debts incurred after the creation of the trust in 1931. These new debts were also secured by the assets of the 1931 trust. The granting of security interests in the trust assets resulted from written and oral pledges given by Julius and Mary (as co-grantors of the trust) to the creditors of Julius. Julius and Mary acknowledged the priorities of these subsequent obligations vis-a-vis the trust assets by various means *57 including payments on account, oral and written communications and recognitions. Shortly after Julius's death, Mary and the surviving children met and reached an understanding with respect to the Michigan property and Julius's debts. They agreed that the valid debts of Julius should continue to be paid. Julius's debts would be paid out of family earnings and assets other than the farm. The farm was to be used for satisfying these obligations only as a last resort. Thus, the property was to be held partly for the protection of creditors, partly for Mary's benefit and partly for the use and enjoyment of the family. The express trust was allowed to continue with the Michigan property being its principal asset. Between Julius's death and April 1, 1958, substantial payments were made to Julius's creditors. These payments, made from the earnings of Julius's sons, were intended to liquidate Julius's obligations and to secure the retention of the Michigan property. Other claims of Julius's creditors were either out-lawed by the running of the statute of limitations or were settled. On or about April 1, 1958, Mary, as co-grantor of the express trust, signed and delivered a letter *58 dated April 1, 1958, to A.M. Smietanka, the trust's sole surviving trustee. In this letter Mary indicated that all of the debts which Julius had incurred by October 2, 1931, had either been satisfied or outlawed by the statute of limitations. Consequently, Mary directed the trustee to terminate the trust. At this time, Mary and the other family members were also cognizant that a substantial amount of Julius's new debts remained. In addition to these debts, money was needed for payment of the Michigan property's taxes and maintenance expenses and for the care and maintenance of Mary. It was felt that title to the farm should be altered in order to facilitate any sales of the property needed to generate required funds. In this regard, Mary's letter of April 1, 1958, requested in addition that the property be conveyed out of trust to Frank J. Smietanka and Virginia Taber, the youngest son and oldest daughter of Mary, respectively, as joint tenants. the trustee subsequently effectuated this request. Mary Smietanka died intestate on December 26, 1966, survived by five children: Virginia Taber; Joseph G. Smietanka; Dorothy Hellmuth; Frank J. Smietanka; and petitioner. These five *59 children constituted her sole heirs at law. Between October, 1958, and January, 1969, seven parcels of the property were sold for gross consideration of $ 84,850. In addition, an easement was also granted for $ 300 in consideration. The $ 84,850 in sales proceeds were received by petitioner and Joseph Smietanka; the $ 300 easement proceeds were retained by Frank J. Smietanka. The proceeds from the sale of the seven parcels were used to pay off a substantial portion of Julius's debts as well as real estate taxes and other delinquencies related to the Michigan property. From April of 1958 until January of 1969, Virginia Taber and Frank Smietanka dealt with the peoperty and generally deported themselves to other family members as mere "conduits" of title, the purpose thereof being to effectuate the family plan of selling the property in order to liquidate their parents' debts. [2] However, in January of 1969, Frank Smietanka claimed absolute ownership of an undivided one-half interest in the remaining property and subsequently he conveyed several portions of the property to his wife and daughter. Frank's co-tenant, Virginia Taber, rejected his claim of absolute ownership. Her *60 behavior continued to conform with her understanding that ownership of the property was merely on a conduit basis for family purposes. In August, 1971, an action in equity was instituted in the Circuit Court of Berrien County, State of Michigan. This suit was entitled Joseph G. Smietanka, Dorothy Hellmuth and Allan J. Smietanka, Plaintiffs v. Frank J. Smietanka, Theresa Smietanka, Francine Smietanka and Virginia Taber, Defendants; petitioner was the attorney for the plaintiffs therein. The purpose of the suit was to establish the fiduciary nature by which Frank Smietanka and Virginia Taber held title to the Michigan property. The plaintiffs in that action requested, inter alia: that the conveyances by Frank Smietanka be declared void; that Virginia Taber be declared sole trustee of the Michigan property for purposes of liquidating any property needed to pay the outstanding claims against Julius's or Mary's estate; and that the interests of the surviving children in any property remaining after the extinguishment of all said debts be established. On December 3, 1973, Circuit *61 Judge James E. Hoff rendered an opinion in the above-named equitable action. In that opinion Judge Hoff determined that Frank Smietanka and Virginia Taber, as joint tenants, held legal title to the property in a fiduciary capacity and not as absolute owners. Judge Hoff consequently ordered the imposition of a constructive trust upon the property. This trust, which Judge Hoff stated "shall and does hereby arise by operation of law so that justice and equity may be done" related back to 1958, the date legal title was conveyed to Frank J. Smietanka and Virginia Taber. The express purposes of the constructive trust were to sell the property in order to pay Julius's remaining debts and to distribute any remaining trust property (including sales proceeds) equally to the five children (one of whom was petitioner) who survived mary Smietanka. By December 11, 1975, all of the debts of Julius Smietanka that had existed as of January 4, 1951, were satisfied or outlawed with the exception of $ 6,600 owed to George Hellmuth (husband of Dorothy Hellmuth); $ 16,449.49 owed to Salomea Zawadska; and $ 3,500 owed to Joseph Barzynski. On December 11, 1975, petitioner advanced $ 16,449.49 to the *62 Polish Peoples Republic on behalf of Salomea Zawadska and $ 3,500 to the sole heirs of Joseph Barzynski in satisfaction of their claims against Julius's estate. Also by that date, Dorothy Hellmuth, as heir of her deceased husband, George Hellmuth, waived the $ 6,600 claim against the estate of Julius. As of December 15, 1975, the parties to the action had stipulated to the following dispositions of the remaining trust property: lakefront parcels (100 feet in width) each to Dorothy Hellmuth, Virginia Taber and Joseph Smietanka; a specified portion of the property to Frank Smietanka and his wife Theresa; a lakefront parcel (approximately 222 feet in width) to Allan Smietanka and his wife, Virginia. The larger size of petitioner's parcel is attributable to the additional advances (approximately $20,000) he had made in liquidating the remaining claims against his father's estate. In an Order dated December 15, 1975, Judge Hoff order, inter alia: the approval of the accounting submitted by constructive trustee Virginia Taber; that the Constructive trustee execute deeds in accordance with the parties' stipulation; and termination of the constructive trust. Pursuant to this Order, *63 Virginia Taber executed a deed conveying the 222-foot lakefront parcel to petitioner and his wife as tenants in common. [3] In an Order dated May 30, 1979, Judge Hoff formally ratified and confirmed the deed by Virginia Taber to petitioner and his wife. The property which petitioner acquired had been subject to continuing erosion between the years 1970 and 1976. The damage to the property was a direct result of high water levels on Lake Michigan as well as several years of catastrophic storms. The total amount of land lost during the period from November, 1974, to July, 1976, was 36,276 cubic yards. Generally, damage to the property did not occur during the three-month period between late November and the latter part of February. During that time, an ice barrier would form and thus prevent further erosion of the lakefront. During 1975, six storms occurred: three in the spring shortly *64 after the ice barrier disappeared (i.e., late February or early March) and three in the fall during October and November. No storms occurred after the latter part of November as the ice barrier had formed by that time. In December of 1975, the constructive trustee determined that the Michigan acreage was unsalable due to the prevailing erosion; sale of the property was considered impossible until the erosion was stabilized. Petitioner, on behalf of the trust, had listed the property for sale in 1974 for $ 27,500 for a 100-foot parcel. This listing did not result in any sales In 1977 petitioner constructed a Wausau home on the property at a cost of $ 70,000. On his 1975 tax return, petitioner claimed a casualty loss for the property in the amount of $ 16,954.40. Respondent dis-allowed this loss in full for the reason that petitioner had not established the basis of the property destroyed. OPINION Petitioner acquired the property for which he claimed a casualty loss from his parents in a rather roundabout way. Petitioner's father, Julius, fell on hard times as a result of the Depression. Consequently, in 1931 the Michigan property was conveyed to a trust, the purpose *65 of which was to provide for payment of Julius's debts and an orderly liquidation of his assets. The trust provided that after this purpose had been accomplished any of the remaining trust corpus was to go to Julius and Mary, or the survivor thereof, or to the survivor's heirs if both of them had died. Subsequently, the trust assets became encumbered by obligations Julius had incurred after the trust's creation. By the time of Julius's death in 1951, he had incurred over $ 79,155 in these "new" obligations; most of the pre-1931 debts had been satisfied by then. In 1958, Mary and the other family members agreed that the original purpose of the express trust had been accomplished and that legal title to the property should be restructured in order to facilitate any sales of the property needed to liquidate the remaining obligations. To that end, Mary, as co-grantor of the 1931 trust, conveyed the property to Virginia Taber and Frank Smietanka as co-tenants. Several sales generating over $ 84,000 in proceeds occurred between 1958 and 1969. In 1969, after Mary died, Frank Smietanka claimed that he possessed an absolute ownership interest in his jointly-held portion of the *66 property. He consequently conveyed several parcels of the property to his wife and daughter. A lawsuit by the other family members ensued. Judge James E. Hoff, the judge in that case, subsequently ruled that Virginia Taber and Frank Smietanka had held the property merely in a fiduciary capacity and accordingly ordered the imposition of a constructive trust upon it. Judge Hoff ruled that the purpose of this trust was to liquidate remaining obligations of Julius and that any assets remaining after the accomplishment of this purpose were to be split evenly among the five Smietanka children who had survived Mary (her heirs-at-law). The conveyances by Frank to his wife and daughter were nullified. The remaining debts of Julius were not fully liquidated or settled until December 15, 1975. Either on that date or sometime shortly thereafter, a portion of the Michigan property was conveyed to petitioner in accordance with Judge Hoff's Order (which in turn was based upon a stipulation of the parties). Casualty losses are generally deductible under section 165(a); subject, however, to the limitations contained in section 165(c)(3). Section 1.165-7(b)(1), Income Tax Regs., provides *67 that in the case of a casualty loss, the amount of the loss for purposes of section 165 is the lesser of the reduction in the property's fair market value as a consequence of the casualty or the property's adjusted basis under section 1011. Where a taxpayer fails to prove his basis in the damaged property, the loss cannot be either computed or allowed. Bonney v. Commissioner,247 F.2d 237 (2d Cir. 1957), cert. denied, 355 U.S. 906 (1957); Millsap v. Commissioner,46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968). Here, the record is devoid of any convincing evidence as to either the decline in the property's fair market value [4] or its adjusted basis at the time the storms occurred in 1975. For this reason alone respondent's determination would be sustained. Petitioner, however, points to the $ 19,949.49 he paid to or on behalf of Julius's creditors as proof of his basis in the property. Petitioner maintains that he acquired *68 a basis in the property by a purchase from the trustee when he paid the remaining creditors shortly before December 15, 1975. Although this contention might be tenable in other circumstances, petitioner's argument illustrates the fundamental flaw in his claim for a deduction -- he simply did not own the property at the time the casualties occurred in 1975. Any basis resulting from these payments would have been acquired by him no earlier than December 15, 1975, the date of Judge Hoff's Order. The evidence adduced in the instant case shows, and we have found as a fact, that the damage to petitioner's property in 1975 would have occurred no later than sometime in November, at which time the property was still held by Virginia Taber as constructive trustee. At that time petitioner did not own the property. Rather, he merely possessed a potential remainder interest in the corpus of the court-imposed trust. In our view, he is not entitled to deduct casualty losses which transpired before his acquisition of an interest in the subject property. Swoboda v. Commissioner,258 F.2d 848 (3rd Icr. 1958); [5] cf. Krause v. Commissioner,497 F.2d 1109, 1112 (6th Cir. 1974) *69 (Since trust and grantor-taxpayer were separate tax entities, grantor was not entitled to credit the taxes paid by the trust against his own tax liability). Accordingly, we hold that petitioner is not entitled to a casualty loss deduction for the year 1975. Decision will be entered for the respondent.
Footnotes
1. This figure does not include outstanding taxes or other obligations relating to the Michigan property.↩
2. It appears from the record that Mary had a small number of debts in addition to those of Julius.↩
3. It is not clear exactly when this conveyance occurred as the record only contains an unexecuted copy of this deed, dated December 15, 1975. It is evident, however, that this conveyance could not legally have transpired any earlier than December 15, 1975, the date of Judge Hoff's Order.↩
4. Petitioner's assertion that the property became "worthless" as a consequence of the storms is undercut by the fact that he subsequently constructed a $70,000 house on the property.↩
5. See also Watkins v. Commissioner,T.C. Memo. 1979-270↩.